At the council table, I'd like to introduce Leslie Mitchell. She assisted me on the briefs, but I'll be making the oral argument. Can I reserve some time? As much time as you want, but when the clock ticks down to zero, you're out of time for both direct and rebuttal. I'd like to reserve around five minutes. One point of clarification that I would like to make is that I'm not a member of the board. And so it's perfectly clear, is that Sandvick is not advocating a public policy that's based on federal rule of evidence 412 solely. Rather, the public policy argument is grounded in Title VII of the Civil Rights Act of 1964, as well as the Supreme Court decisions and the appellate court decisions which require an employer to provide a workplace free of sexual harassment. And when harassment occurs, that it takes appropriate actions to remedy the past discrimination and to ensure that future harassment does not occur by the harasser or other employees. And also that the employer is required to create an environment in which the victims of sexual harassment will be willing to come forward to report incidents of sexual harassment. We're also relying on the EEOC's guidelines on sexual harassment and the EEOC's compliance manual. Those documents are cited in the Newstate case. But would any of those documents or procedures or anything else be just flat-out violated by the reinstatement of this grievance? Well, I would frame the argument a little bit differently, Your Honor. Well, you might. But what about my question first? Okay. I believe it would under the circumstances of this particular case. And if you'd like me to elaborate. Well, then you're free to. Okay. In this particular case, the arbitrator interpreted the contract so that the dispute resolution at the – pursuant to the dispute resolution procedure, the union counsel was allowed to ask the victim about his sexual predisposition and his sexual history. That in and of itself, we believe, is a basis for overturning the award. Wait a second. You're not suggesting, as the Supreme Court has time and again told us, that we perform the same error-correcting function when we review arbitrator decisions as we do in district courts and administrative agencies who violate rules of evidence or rules of procedure in the conduct of the trial or proceeding, are you? You see, this is the precise point I'm trying to make, is you are arguing that. We are arguing that the public policy under Title VII is that an employer is required to create conditions. No, no, no, no. You're not answering my question. You're arguing, I think, that we should overturn the award because the arbitrator made an error by permitting a lawyer to ask an impermissible line of questioning that prejudiced your client. And that is a classic error review that we would perform if you were up here trying to overturn, let's say, a Title VII judgment in the district court. But the Supreme Court has told us, we don't do that. We don't reach into arbitration proceedings and tell the arbitrator, you know, you committed error by allowing this line of questioning or by admitting this evidence into the case, do we? And if so, I'd like to know what your case is that contradicts the Supreme Court principle, because we've gotten our wrist slapped before when we did this. Well, again, I believe it's a case of the first impression where an arbitrator allowed the questioning of a sexual harassment victim in this type of manner where it was unnecessary and irrelevant. What's your best case to support our authority to step into the arbitration proceeding and to order? And I guess the remedy would have to be we vacate the award and we remand for an entirely new arbitration proceeding and exclude this evidence from the proceeding. That's what you're really asking us for. That is exactly what Sandvik is arguing in this case. How does that square with Supreme Court authority to decide? Well, we don't do that with arbitration. Your Honor, we are also arguing, and the best authority would be Eastern Colt, a Supreme Court decision. In that case, it involved a truck driver who was reinstated who tested positive a second time for drug use. In Eastern Colt, the Supreme Court, number one, I think it was Justice Breyer, joined by six other justices, rejected the narrow positive law approach. And also, in assessing the appropriateness of reinstatement in that case, the court looked at all the facts and circumstances related to the reinstatement. I would suggest to the court that Eastern Colt, the Eastern Colt analysis, rejects the plurality analysis in Stead Motors where the court said reinstatement is reinstatement and the court should go no further. In Eastern Colt, the court looked at the statutory scheme and found that operating, doing a safety-sensitive job while under the influence was a dominant public policy to prohibit that. But they went further and looked at the entire statutory scheme and they found a countervailing public policy of rehabilitation of substance abuse abusers. In our case, we're asserting Title VII as the public policy. There is no such countervailing public policy in our case. There is nothing in the cases that suggest there is a public policy goal of rehabilitating sexual harassers. And quite the contrary, the courts make very clear that the level of sanction that's imposed must be adequate to ensure that the past discrimination is remedied and that it does not reoccur. So that's a major distinction. Kennedy. Are you suggesting, though, that if the company had looked into this harassment and said, we find that there was some harassment, you're suspended for 18 months, that you would somehow be in, and then you didn't come back, you'd somehow be in violation of Title VII? We're not advocating a per se rule. But we are in this particular case in, not only is there no countervailing public policy, such as in Eastern Colt of rehabilitation. In Eastern Colt, the arbitrator placed express conditions upon, it was a conditional reinstatement. And the time off was one condition, but there were conditions such as drug counseling and treatment, mandatory random drug testing in the future. The employee was required to submit a resignation letter. So if he tested positive again, he would self-terminate. And there was also, and I think a critical factor, that the employee in that case was remorseful, and the Supreme Court stressed that fact. In our case, the reinstatement, granted there was a period of time off as a suspension, but there were no affirmative obligations or conditions placed on the reinstatement. The arbitrator did not require that Mr. Jackson learn the company's policies and procedures of sexual harassment. He did not require that he go through any sexual harassment training. He did not require him to submit a resignation letter, as in Eastern Colt. And it's very clear, at least that I would advocate, that the court in reviewing that arbitration award, their reinstatement decision, did not rubber stamp it. They looked at all of the facts and circumstances related to the reinstatement order. And we're not suggesting that this Court should reject the facts as found by the arbitrator. What we're suggesting, and what is appropriate, is that the Court can look at the conclusions that the arbitrator drew from the facts. And if those conclusions are wrong. What if they're seriously wrong? Can we overturn it on that ground? No. You should not be overturning arbitration awards. Because it's a serious error in facts on the part of the arbitrator. But it sounds to me that that's what you're arguing. No, no. We are arguing that reinstatement under the circumstances of this case would violate the public policy which requires an employer to create an environment free of sexual harassment and encouraging sexual harassment victims from coming forward. If the company in the union had entered into a contract with a dispute resolution procedure that said that victims of sexual harassment can be questioned unnecessarily about their sexual history, I would suggest to you that that contract would be void as against public policy it was challenged by a victim or by the Equal Opportunity Commission. How is that different from sort of the typical Title VII case where, because the allegations are of a sexual nature, discovery is necessarily going to get into, you know, very delicate issues of interpersonal relations between the complainant and the alleged harasser and other coworkers? Well, I believe, in answer to your question, there was a problem with that issue prior to evidence code 412 being amended in 1994. Previously, it was applied only in criminal cases. It was extended in 1994 to cover instances of cases involving alleged sexual misconduct, specifically including cases involving sexual harassment. I assume you do a fair amount of labor and employment law as part of your practice. That is correct. I mean, you must have several cases where these sorts of allegations are at issue, and there is always extensive discovery, notwithstanding the rules of evidence that you're referring to. Well, I believe in the 1980s there was a problem of abuse of victims in the discovery process, and I believe that 412 was adopted to solve that. But has it been your experience that all such discovery now ceases and that we never get into any sort of evidence with regard to how the harasser or the victim interacted with coworkers if they involved matters of a sexual nature? If it is, that comes as a surprise to me, because that's not what I'm seeing in the records that are coming before us. No, I would submit, because I do disagree with you a bit, and I would submit that practitioners approach a sexual harassment victim's prior history as a third rail, because if a practitioner gets into that, for example, in a deposition, one would run to the magistrate and seek a protective order and sanctions immediately. There is a Ninth Circuit case involving this precise issue, and the court, the district court felt so strongly about it, they sanctioned the Maui Police Department, and they granted $5,000 in damages to the plaintiff victim because of the emotional distress caused by the questioning. And, I mean, the court, this circuit has recognized the importance of that public policy, and if we carve out collective bargaining agreements that they can't be touched, and it's perfectly victims are fair game. They can be touched subject to certain exceptions, and one of them is the public policy exception. The question is, does this remedy violate that exception? And in response to Judge Canby's question, you really are quarreling with the leniency of the remedy that the arbitrator ordered here, claiming that because it sends the wrong message, then the policy is violated, therefore we must vacate the arbitrator's remedy. I think what we're quarreling with is the arbitrator made no findings that the remedy, if reinstatement were granted, would be sufficient to remedy the past discrimination and future discrimination. And as I understand the Supreme Court, is that this court is not to imply what the arbitrator failed to find. And on that basis, the award should be vacated as well. Was the arbitrator even required to explain the award? No, he is not. But his interpretation is vis-à-vis the collective bargaining agreement. And again, as I understand the court precedence, the Supreme Court precedence, is that it's the court to decide whether the reinstatement in a particular circumstance violates the public policy. Do you want to save some time for rebuttal or do you have some questions? Yes, I'd like to save very well. Let's hear then from Mr. Peterson. May it please the Court. My name is Ken Peterson. I represent the Appalachian Union in this case. This, Your Honors, was a garden variety arbitration case involving the discipline of one male metal fabricator who hurled abusive shop talk at another and was fired for it. And he subsequently lied about his activities in what the arbitrator concluded was an unfairly conducted disciplinary interview. Under the employer's own rules, the grievance's reprehensible language and conduct was classed as a minor offense. As the arbitrator found, there was no physical violence involved and no evidence that the grievant ever physically threatened or touched the victim in any way. The arbitrator, Professor Kenneth McCaffrey, found that the appellant did not have just cause to fire the grievant, Scott Jackson, who had in excess of 20 years of employment with this company, for his admittedly abusive language. The arbitrator instead found that an 18-month suspension of the grievant and putting a suspension on the grievance record was sufficient to impress upon him the seriousness of his misconduct while affording him the opportunity to improve his behavior. It's a serious punishment. Not only does the individual have the grievant have a suspension on his record with the company, which is typically the step closest to termination in the progressive disciplinary ladder, but he also it costs him more than $50,000 in lost wages. It's a serious penalty. It sends a clear message not only to the grievant but to the other workers at Sandvig that this kind of behavior is not tolerant. It is not as if he got a free pass. The award depended in large measure on the arbitrator's factual finding that the punishment exacted from the grievant was discriminatory and that others who engaged in similar misconduct had violated the employer's rules relating to how employees are to treat each other. Others who were engaged in that similar conduct were not disciplined at all. As the arbitrator notes in the award, it's a fundamental rule in labor arbitration that an employer must apply its rules even-handedly and without discrimination. Here, the union's evidence of disparate treatment happened to concern Mr. Lewis, the complaining metal fabricator in the case, or as the company puts it, the victim. Mr. Lewis served two roles in the arbitration hearing. In effect, he was the recipient of the grievant Jackson's harassing language and hence the victim in the company's view, but he was also an example of someone whom the company elected to treat more favorably when it came to discipline. When he himself was charged with harassment by numerous of his female co-workers, the union introduced evidence about the matter in support of its disparate treatment argument. The appellant raises basically two complaints about the award. First, they argue that the award violates public policy found in Federal Rule of Evidence 412 and, as raised here today, some other policies that I don't believe were the subject of the briefing. But Rule 412, of course, is the rape shield rule. They contend that the arbitrator improperly permitted the union to question Mr. Lewis about, quote, his private life and his sexual history, end quote, which allegedly influenced the award improperly. We think that this amounts to what the company is asking for here is for the court to announce a rule that would allow courts to scour arbitration decisions to determine if the arbitrators directly apply evidentiary rules, which the appellant in this case admits do not apply in the arbitration context in any event. But however compelling that argument might be, however much the court would like to see that be the rule in arbitration, this is not the appropriate factual setting for that conclusion. The union did not question Mr. Lewis about his private life and did not question him about his private sexual history. Instead, we questioned him about his behavior at work toward his coworkers. Now, the evidence showed that one of the women he pursued in unwelcome fashion, and she testified at the hearing, by the way, was required to report him to management on no less than three separate occasions, a human resources representative additionally noted, he wrote, that the complaining witness in the case had, quote, come on in a suspicious way, end quote, to as many as three other coworkers. These multiple coworkers complained that Mr. Lewis was behaving inappropriately toward them, yet the evidence showed he was not disciplined in any way for his repeated misconduct toward his coworkers. Now, that evidence is clearly relevant given the union's disparate treatment argument. And the arbitrator so held. The arbitrator noted that Mr. Lewis's behavior was just as serious as that of the grievance, and yet he escaped any punishment. Now, because the evidence of Mr. Lewis's behavior was pertinent to the union's disparate treatment argument, it was therefore offered for a legitimate purpose under Rule 412. That's made clear in federal practice and procedure under the doctrine of multiple admissibility. Evidence offered for a legitimate purpose is not rendered inadmissible merely because it tends to prove something else. If the evidence did not run afoul of Rule 412, it can hardly be said to breach the policy behind the rule, nor can it be said that the arbitrator rejected the policy behind Rule 412. In his decision, he instead carefully analyzed the rule and expressly held that he considered the evidence relating to Mr. Lewis's treatment of his coworkers only for the purpose of examining the employer's disparate treatment of the grievant. The district court recognized this and held that the arbitrator's consideration of the evidence for that purpose was proper under the rules. The evidence was also pertinent to show that the appellant's human resources representatives were not credible when they claimed that the cases of Messrs. Jackson and Lewis were distinguishable because Lewis admitted his misconduct, whereas Jackson did not. And I feel I have to respond to one point made in the reply brief. Opposing counsel suggests that this explanation was manufactured by the union because in the sequence of the hearing, Mr. Lewis preceded Mr. Rhodes in testimony. I would simply note that counsel for the appellant stated in opening statement that the employer had reviewed other cases involving alleged harassment before it reached the decision to fire Mr. Lewis. Further, the union had subpoenaed one of Mr. Lewis's female targets to testify, getting her off work to do so. The employer knew, in other words, that Lewis's behavior toward his coworkers was at issue. And both parties were certainly aware in advance of the hearing that an important issue in the case was whether Mr. Lewis's own behavior was comparable to that of the grievant, all of which is to say that the sequence of testimony is irrelevant. We well knew in advance of the hearing that the employer was going to try to distinguish Mr. Lewis's case from that of the grievant, Mr. Jackson. In its second argument, the appellant claims that the arbitrator did not make a finding that Mr. Jackson was amenable to discipline for his offense of swearing at Mr. Lewis in pretty vile terms. The union does not consider that such findings are required, and we do not believe that the appellant has furnished any authority for the proposition that such findings are required. The fact that a majority of this Court in Stead Motors did not agree that amenability to discipline is implicit in every award reducing discipline is not to say that such a majority opinion is not necessary. There simply is no authority for the proposition that an arbitrator is required to make express findings regarding a grievance of amenability to discipline. In that regard, it's notable, I think, that the principal case cited by the appellant for the proposition, the Chrysler Motors case, the Seventh Circuit Court of Appeals case, not only does not require such findings but, in fact, endorses the approach of the majority in the Stead Motors case. Mr. Peterson, am I correct? I'm looking at Excerpt of Record 28, which is page 21 of the arbitrator's award. I guess it would be the first full paragraph that begins with the sentence, third comma, since the company's disciplinary policy calls for various levels of discipline. Is that the closest the arbitrator comes to addressing whether or not Mr. Jackson is amenable to rehabilitation? I believe he addresses it on multiple occasions, Your Honor, and I would direct the Court's attention to page 27 of the arbitrator's award immediately before subheading B, due process issues, where the arbitrator wrote, The misconduct of the grievant is readily amenable to progressive discipline in these circumstances. Further? At page 21 of the arbitrator's? Which is where I was just reading. You were on 21, Your Honor? 21, yes. It's Excerpt of Record 28, but it looks like page 21 of the. Yes. Where the arbitrator says, Under these circumstances, the grievance is reasonably to be advised. Yes. Those are the two principal sources for our contention that as a factual matter, while it's not required as a legal matter, as a factual matter, the arbitrator did consider the grievance amenability to discipline. And as the Court, I think, anticipated in my argument, as the Supreme Court held in 1962 in the Enterprise Wheel case, arbitrators have no obligation to give any reasons for an award, and this Court does not sit to review the decisions of arbitrators in the same fashion that it reviews decisions of district courts. If requiring expressed findings about amenability to discipline would run counter to this binding authority, as the district court recognized. Further, Sandvik did not ask for such a ruling. It did not ask the arbitrator, One of the issues we want you to consider is his amenability to discipline. We believe he is not amenable to discipline, and we want a finding on it. They didn't ask for that. Having failed to ask the arbitrator to do what they're now criticizing him for not doing, I think it's clearly a situation where the waiver is involved. And in any event, as the Court noted, the arbitrator did make findings that the grievance was amenable to discipline. And by the way, the appellant concedes that he concedes this with respect to the charge that the grievance had been dishonest in his disciplinary interview. To the union, it requires a particularly crabbed approach to the review of labor arbitration awards to suggest that an arbitrator must make a finding of amenability to discipline for each charge that he determines to reduce to a lesser penalty. If the grievance is amenable to discipline for lying, and the appellant concedes that the arbitrator is so found, then he is amenable to discipline for the verbal abuse of his coworker. And again, I was going to cite the Court to the provisions we relied upon, but we think that those findings referenced by the Court are clearly a finding that the grievance was capable of improvement. And so to the extent that such findings are required, we think that the arbitrator's written award and his imposition of a suspension on the grievance and his, in effect, fining him $50,000 is a substantial punishment. And again, the Court would urge the Court to review Professor St. Antoine's suggested approach in cases involving labor arbitration awards based on public policy. As we noted, his writings have influenced this Court in the Stead Motors case and the Supreme Court in the Eastern Associated Coal decision. If the employer could unilaterally have reinstated the grievance without violating public policy, and that is the result of the arbitration award in this case, it cannot complain that the arbitrator, its designated contract reader, its surrogate, did so. Here, because the company was legally entitled to reinstate him, the fact that the arbitrator, serving as the company's surrogate, did so furnishes no basis for complaint on public policy grounds. The union has asked to be awarded fees in this case. We believe that this is within – this is a case that has been addressed repeatedly by this Court and by the Supreme Court and by numerous other courts. We don't believe that there is a substantial issue involved in this case. I guess the district court may be – I mean, the district – you know, the district court in issuing a stay order kind of seems to have taken a different view. I mean, he sort of said, well, you know, there are serious issues for appeal. Yes, Your Honor. The district court did stay the decision. But more importantly, the Court affirmed the arbitrator's award in all respects. I can't account for the stay. We wish it hadn't been entered. We wouldn't be here now going on eight years following the discharge, I don't think. But at best, I think the district court's stay, when weighed against the district court's decision affirming the arbitrator's award, is a push. And we think that this Court – we did not appeal the district court's denial of attorney fees below, but we think with the district court's decision in this case that the appeal is unjustified. We think it is, in fact, frivolous, and I would submit that to the Court's informed discretion. Thank you for your attention this morning. Thank you, Mr. Peterson. Mr. Norland, you have the last word. Thank you, Your Honor. What I might not have made clear – maybe I did, and you're just disagreeing with me – is that it's not the remedy of reinstatement. It violates the public policy underlying the Federal Rule of Evidence 412 of encouraging victims to come forward. What violates that underlying public policy is the abuse of the victim unnecessarily in the arbitration proceeding. There is an affirmative obligation on employers to fashion dispute resolution procedures that encourage the victims of harassment to come forward. These arbitrations do not take place in a vacuum. It's not in the record, and I can't prove it, but people do talk. And what happened at this arbitration is probably much spoken about in the workplace. And as I asked on the record at the arbitration, when I was objecting to these types of abuse during the arbitration proceeding, with respect to disparate treatment, the only evidence relevant to disparate treatment is what Ms. Torrey complained of to management. You do have an unfortunate fact, and that is that the complainant here, Mr. Lewis, was himself the subject of an internal HR investigation based upon his own three complaints of his own sexual misconduct. That's a little different, it seems to me, than the rape shield law and the policy of protecting people who are complaining that they were abused from having to submit to examination on their own prior, you know, history of sexual behavior. Your Honor, I think you're right on the point here. The misconduct of the victim is not to become the central inquiry and be the basis for abusing the victim who reports the harassment. But the problem, as I understand it, is that the union was trying to show disparate treatment, and it just so happened that there – I mean, they could have taken another employee who, coincidentally, was not the complainant, if there were any other cases, and I don't know that there were. But in this case, the apple, to compare with the Jackson apple, happened to be Mr. Lewis, and the fact that he himself had been treated differently when female employees accused him, as opposed to Mr. Jackson, who was accused by a male. But the only evidence relevant to disparate treatment by the company is what was reported to the company, not what was going on in Mr. Lewis's head or whether Mr. Lewis offered to leave his wife to Ms. Torrey. There's no evidence in the record that Ms. Torrey ever reported those things to management. So you're really back to the specific line of questioning that led to the nonresponsive admission by Mr. Lewis of the beauty and the beast fantasy and so on. You don't dispute that if there was disparate treatment here, the union was entitled to question the HR director about how prior complaints of sexual misconduct against other employees were handled. And that is precisely the point. The HR people were present and available to testify. Ms. Torrey testified at length. There was no need to question Mr. Lewis about these things and humiliate him in such a fashion. He was asked. Wait a minute. You're suggesting that the rape shield rule and policy behind it would prevent the questioning of the directly involved witness, even though it might be appropriate in eliciting evidence of the disparate treatment to inquire as to the circumstances surrounding the prior complaints and what the company did with them. Yes, Your Honor. I can only question the HR director on that subject. Is that what you're arguing? No, Your Honor. But as the remember the findings of the arbitrator or binding, the arbitrator found on the record that the questioning of Mr. Lewis along this line was unnecessary. He also stated at excerpts 167 that he was allowing the evidence to assess Mr. Lewis's reaction to the alleged harassment by Jackson. It was only later in the arbitration decision that he got into this whole analysis of disparate impact. But if that were what you see, the problem is the questioning should have been stopped. There should have been a protection of that victim. There should have been a foundation laid as to the relevance of that evidence. Instead, he was asked six times whether he had let him. Counsel, if we agree with you, is that a basis for overturning the decision? Yes, Your Honor, because what victim of sexual harassment at Sandvik after the victim was victimized in the arbitration proceeding will come forward with a complaint of harassment. Well, that's kind of speculative. All right. Thank you, counsel. You're out of time. I thank both counsel for the argument.
judges: Canby, Tallman, Rawlinson